In re Karen GRANT, Debtor.

Karen GRANT, Plaintiff,

v.

SUPERIOR MOVING & STORAGE, INC.
and Mitchell W. Miller, Chapter 7
Trustee, Defendants.

Bankruptcy No. 94–12836 DWS.
Adv. No. 94–0505.

United States Bankruptcy Court,
E.D. Pennsylvania.

May 19, 1995.

Patricia A. Cochran, Robert F. Salvin, Temple Legal Aid Office, Philadelphia, PA, for debtor Karen Grant.

Edward J. Hayes, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Superior Moving & Storage, Inc.

Mitchell W. Miller, Chapter 7 Trustee, Miller & Miller, Philadelphia, PA.

Joseph Minni, U.S. Trustee, Philadelphia, PA.

### OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Debtor's First Amended Complaint for Conversion of Personal Property and Violation of the Unfair Trade Practices and Consumer Protection Law (the "Complaint"). The Debtor seeks to hold Superior Moving & Storage, Inc. ("Superior") liable for the value of personal property which Superior moved from the Debtor's apartment, stored pursuant to a contract with the Philadelphia Housing Authority ("PHA") and ultimately disposed of without her consent.

### BACKGROUND.

The undisputed facts are as follows. The Debtor was evicted from a PHA unit (the "Premises") on July 29, 1993 for nonpayment of rent. Prior to her eviction she rented an apartment from PHA in which she and her three children resided. The Debtor does not contest the eviction as improper. PHA had an extant contract with Superior dated June 11, 1991, extended pursuant to Agreement dated May 27, 1993, to pack, move and store the goods located at the housing units of evicted PHA tenants (the "Superior–PHA Contract"). Exhibit P–4. Superior is in the

business of storing and moving household goods. Record at 63. Superior packed the Debtor's furniture, clothing and other items located in the Premises (the "Property") on July 29, 1993 and moved them to storage in its facility in Philadelphia, Pennsylvania.

On the day of the eviction, the Debtor was not physically at the Premises when the eviction began but returned to the Premises when notified by a neighbor that the eviction was in progress. Record at 5. Although the Debtor claimed repeatedly that she did not know when the eviction was to occur, she admitted that the Sheriff put a notice on her door telling her the date of the eviction. Record at 60. The Debtor took no steps to remove her Property from the Premises prior to the eviction.

At the time of the eviction, Superior provided the Debtor with documents informing her that she must notify Superior within 30 days by certified mail of whether she intended to continue to store the Property with Superior, pick them up or have Superior deliver them to another location. The documents also contained Superior's telephone number. Exhibit P–1.

The Superior–PHA Contract requires that Superior store goods of PHA evictees for 30 days. Exhibit P–4 at C–1. The PHA pays for this 30 days of storage. The Debtor admits that PHA is not required to store an evicted tenant's personal property but may leave it on the street. Record at 117. The Debtor's Property was delivered into storage on July 29, 1993. The 30 day period ended August 29, 1993 prior to which the Debtor failed to pick up her Property. Superior and the Debtor spoke on the telephone during the 30 day period and the Debtor indicated that she wanted to continue to store her Property at Superior's facility. Record at 81. The Debtor did not enter into a contract with Superior to provide continued storage before or after the 30 day period. After the 30 days, the Superior–PHA Contract provides that Superior may dispose of the goods. Exhibit P–4 at C–1. After approximately 42–45 days, Superior disposed of the Debtor's Property by donating that which was not broken or in poor condition to charity and discarding the rest.[1] Record at 83, 88. The Debtor contacted Superior on September 27 or 28, 1993, approximately 60 days after her eviction, stating that she wanted to arrange for continued storage. Record at 22–3, 52. Superior informed the Debtor that it had already disposed of her Property. Prior to disposing of the Property, Superior did not send the Debtor specific notice stating that the Property would be sold or disposed of at a certain date and time.

The parties disagree on the number and content of telephone calls during the first 30 days of storage. The Debtor claims to have called Superior approximately 25 times and that she was not given any helpful information. Specifically, the Debtor claims that she was never told that her Property would be disposed of after 30 days unless she took action either to move the Property or arrange for continued storage during that time. Record at 23. Mark Brenfleck, the owner of Superior, testified that he is the only person at Superior who speaks with PHA evictees, and that he spoke with the Debtor on three occasions during the first 30 days of storage and told her during each conversation that the Property would be disposed of after 30 days. Record at 73, 93.

The parties also disagree as to the value of the Property. The Debtor claims that the Property, consisting of kitchen furniture, refrigerator, various appliances, living room furniture, three bedrooms of furniture, clothes, toys, family pictures, letters and personal papers had a value of $6,706 when acquired in 1992. Exhibit P–7. Superior did not affix a value to the Property but did present its bill of inventory itemizing the Property and noting its condition on the date of receipt into storage. Exhibit C–6.

The Debtor seeks to hold Superior liable on the following grounds: (1) Superior disposed of the Property and otherwise acted with respect to the Property in violation of Article 7 of the Uniform Commercial Code, 13 Pa.C.S.A. §§ 7101 *et seq.;* (2) Superior

---

1. Superior did not provide a breakdown of what items were donated to charity and what items were discarded. No receipt was received from the charity nor did Superior claim a tax deduction for the donation. Record at 100.

"converted" the Property under 13 Pa.C.S.A. § 7210(i) and common law; (3) Superior's violation of the aforementioned statute constitutes a violation of the Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S.A. § 201–3, commonly referred to as "UDAP"; and (4) Superior's disposition of the Property was a fraudulent transfer pursuant to 11 U.S.C. § 548. The Debtor requests actual damages in the amount of $5,560 (80% of the 1992 value)[2], attorneys' fees, treble damages under UDAP, $5,000 for emotional distress, and punitive damages.

*DISCUSSION.*

**A.**

*Conversion.* The Third Circuit Court of Appeals in *Baram v. Farugia,* 606 F.2d 42, 43 (3d Cir.1979) stated as follows with respect to common law conversion in Pennsylvania:

> We ... are satisfied that conversion under the common law of Pennsylvania may be conceptualized as follows: Conversion is an act of willful interference with the dominion or control over chattel, done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession.

See *Martin v. National Surety Corporation,* 437 Pa. 159, 262 A.2d 672 (1970); *Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 451, 197 A.2d 721, 726 (1964).

■ Without regard to the Warehouseman's Act which, as will be discussed below, creates duties that go beyond the common law, we first examine the relationship between Debtor and Superior to determine whether its actions rise to the level of conversion. We begin with the reason that Superior was storing Debtor's goods, i.e. it agreed to do so pursuant to a contract with PHA which had acquired them when it evicted Debtor. Both the Debtor and Superior cite to *McCready v. Booth,* 398 So.2d 1000 (Fla.App.Ct.1981) as stating the generally accepted proposition that a landlord has "no duty to store or otherwise maintain the [tenant's] personal property once his tenancy had been lawfully terminated." *Id.* at 1001.[3]

■ The court in *Banks v. Korman Associates,* 218 N.J.Super. 370, 527 A.2d 933 (1987) suggests that a duty may arise where a landlord, although not required to do so, agrees to store a tenant's property after eviction. In that case the landlord lawfully evicted the tenant but agreed to allow the tenant to keep her personal property at the premises until she found a new place to live. The court further stated, however, that the landlord's agreement to allow the tenant to leave her personal property in the apartment created a "gratuitous bailment because the landlord received no consideration for keeping the furniture" for the tenant. 218 N.J.Super. at 372–73, 527 A.2d at 934. The majority view is that a gratuitous bailee is liable only for gross negligence or bad faith. *Id.* This is also the law applied by the courts in Pennsylvania. *See, e.g., Ferrick Excavating and Grading Company v. Senger Trucking Company,* 506 Pa. 181, 188, 484 A.2d 744, 748 (1984).

■ Initially we note that PHA, not Superior, created the gratuitous bailment with Debtor. Superior's relationship was with PHA pursuant to the Superior–PHA Contract.[4] PHA, not Superior, established the termination of that bailment after 30 days. Given PHA's ability to leave the property of

2. We note that 80% of $6,706 is $5,364.80, not $5,560.

3. In *McCready,* the tenant was evicted for failure to pay rent and his personal property was placed "at the edge of the street" and various passersby stole the property. *Id.* The tenant sued the landlord for damages for failing to protect his personal property. In finding in favor of the landlord the court stated as follows:

> We know of no statutory or case law holding that a tenant, who has been lawfully evicted pursuant to statutory procedure, can maintain an action in tort against a landlord for damaged personal property, absent some showing that such damage was intentionally or maliciously done,....
> *Id.*

4. The Superior–PHA Contract specifically provides that

> After thirty (30) days from the date of eviction has elapsed, the contents stored for the evictee may be disposed of unless another arrangement has been made between the evictee and [Superior].
> Exhibit P–4 at C–2.

an evictee "on the street" without incurring liability from the evictee, we cannot find that PHA acted in bad faith or with gross negligence by limiting the period as to which it would assure the cost free storage of an evictee's property to a stated 30 day period. In storing the Property *for PHA,* Superior's duty was to PHA, its bailor. It would be anomalous to find that Superior's common law obligation to Debtor was greater than that of PHA to Debtor when Superior was acting as the agent of PHA in storing the Property.

We disagree with Debtor's view that so long as Debtor takes no action to reclaim her goods, Superior must hold them. We think it is sufficient that Debtor knew that Superior would hold them for 30 days and absent action on her part thereafter, they would be disposed of. While we agree that Superior did not secure the consent, actual or implied, of Debtor to dispose of the goods, it was not required to do so. Rather Debtor, with notice and knowledge of the consequences, took no timely action and Superior was lawfully justified in disposing of the Property. To the extent Superior's storage of the goods past the 30 day period can be construed as a gratuitous bailment, we cannot find Superior to have acted in bad faith or grossly negligent in disposing of the goods. Debtor failed to claim them several weeks after the appointed hour. Accordingly, we find no common law conversion to have occurred.

### B.

Applicability of Warehouseman's Act. The Debtor argues that the relationship between Superior and the Debtor is covered by Article 7 of the Uniform Commercial Code, 13 Pa.C.S.A. §§ 7101 *et seq.* (the "Warehouseman's Act"), and Superior has violated that statute. Superior argues that its obligations were fixed solely by the Superior–PHA Contract which is the only agreement to which Superior is a party relating to the storage of the Property.

Superior, however, is a "warehouseman" within the definition of § 7102 of the Warehouseman's Act, i.e., "a person engaged in the business of storing goods for hire." As such, it is subject to the duties imposed on warehousemen under the Warehouseman's Act. The Warehouseman's Act places a duty on a warehouseman seeking to terminate storage to follow certain statutorily proscribed procedures for the benefit of the person on whose account the goods are held *as well as any other person known to claim an interest in the goods.* This duty includes notice of the demand for removal of the goods, notice of the intended disposition of the goods and disposition in accordance with § 7210 of the Warehouseman's Act. *See* Warehouseman's Act §§ 7206 and 7210(a) and (b). Courts have specifically found these duties to be owed to evictees whose goods are placed into storage by an evicting landlord or law enforcement official. *See Miller v. Henshaw,* 808 P.2d 715, 14 U.C.C.Rep. Serv.2d 542 (1991); *Moore v. Republic Moving & Storage, Inc.,* 548 N.E.2d 1211, 11 U.C.C.Rep.Serv.2d 193 (1990); *Young v. Warehouse No. 2 Inc.,* 143 Misc.2d 350, 540 N.Y.S.2d 654, 9 U.C.C.Rep.Serv.2d 204 (1989); *Owen v. Treadwell,* 11 Kan.App.2d 127, 715 P.2d 1040, 1 U.C.C.Rep.Serv.2d 198 (1986). *See also United Elastic Corp. v. Roadway Express, Inc.,* 5 U.C.C.Rep.Serv. 1008, 1968 WL 9269 (N.Y.Sup.Ct.1968) (liability for failure to notify original shipper and original consignee of removal and sale of goods stored by common carrier). The plain language of the Warehouseman's Act evidences the drafters' intention that its protections extend not only to the person actually storing the goods, PHA in this case, but also to any other person claiming an interest, which would clearly include the owner, the Debtor here. Thus, notwithstanding the terms of the Superior–PHA Contract and the fact that Superior complied with those terms, Superior's actions must be examined by reference to the requirements of the Warehouseman's Act.

Section 7210(i) relating to a warehouseman's liability for damages for his noncompliance with the requirements for sale under the statute provides independent evidence that a warehouseman's obligation is not limited to the person on whose account the goods are stored but rather extends to the *owner* of the goods for all damages caused by his failure to comply with the requirements for

sale. *Steiner v. Lurie & Quaker Storage Co.,* 6 Phila. 107, 1981 Phila.Cty.Rptr. LEXIS 24, at *5 (C.C.P. (Phila.), May 13, 1981). Likewise, the provision that after a warehouseman satisfies its lien by selling stored goods, he "must hold the balance of the proceeds, if any, for delivery on demand to any person to whom he would have been bound to deliver the goods," Warehouseman's Act §§ 7206(e), 7210(f), supports the existence of a duty to the owner of the goods. The cases make clear that the warehouseman is not an owner with rights attendant to an owner, but merely a lienholder who may, assuming compliance with the statute, thereafter dispose of stored goods to satisfy its lien. *Owen,* 11 Kan.App.2d 127, 715 P.2d 1040, 1 U.C.C.Rep. Serv.2d 198. While this is not a situation where charges are claimed by the warehouseman (and thus no lien exists), the statute that balances the right of the warehouseman to remove the goods and be paid for storage with the right of the owner to recover the goods or receive their fair value, nonetheless applies. *Young,* 540 N.Y.S.2d 654, 9 U.C.C.Rep.Serv.2d 204.

*Compliance with Warehouseman's Act.* The Debtor argues that Superior failed to comply with § 7206(a) of the Warehouseman's Act which provides as follows:

§ 7206. Termination of storage at option of warehouseman.

(a) General rule.—A warehouseman may on notifying the person on whose account the goods are held and any other person known to claim an interest in the goods require payment of any charges and removal of the goods from the warehouse at the termination of the period of storage fixed by the document, or, if no period is fixed within a stated period not less than 30 days after the notification. If goods are not removed before the date specified in the notification, the warehouseman may sell them in accordance with the provisions of section 7210 (relating to enforcement of lien of warehouseman).

■ Superior gave appropriate notice of its demand for removal of Debtor's goods and discharged that warehouseman's obligation when it notified Debtor, a party with an interest in the goods, that, absent further arrangements made by her, the Property would be held for 30 days, the period of storage fixed by the Superior–PHA Contract, and thereafter disposed of. While we find that the notice provided to Debtor on the date of her eviction, Exhibit P–1, could have been clearer in stating the consequences of the evictee's failure to take one of the three steps required by Superior with respect to the Property, any ambiguity was cured by Brenfleck's multiple telephone advices to Debtor. The Debtor admitted she knew that she did not have to pay for the first 30 days' storage but was responsible thereafter. She also admitted she knew she had to make other arrangements within the 30 day period. She also admitted she did not make other arrangements within this period of time. While the Debtor denies knowing that the Property would be disposed of if she did not act within the 30 day period, we find her testimony on this point to be incredible. Exhibit P–1, which she received on the day of the eviction, even though it did not state the consequences of failure to act, clearly informed the Debtor that she must act within 30 days. We credit the testimony of Superior's owner that he told the Debtor on three occasions during the 30 day period that the Property would be disposed of if she did not act within the 30 days.

Since § 7206 does not require notice of redemption to be in writing, we find Superior's notification to be sufficient to allow Superior to dispose of the Property at the termination of the period fixed by the documents, i.e. the thirty day period of storage established by the Superior–PHA Contract and Exhibit P–1.

■ Section 7206 provides that if goods are not removed from storage by the date set forth in the notice, the warehouseman may sell them in accordance with the provisions of § 7210.[5] The Debtor contends that the re-

---

5. Sections 7210(a) and (b) are relevant hereto and provide as follows:

§ 7210. Enforcement of lien of warehouseman.

(a) Sale of goods to enforce lien.—Except as provided in subsection (b), the lien of a warehouseman may be enforced by public or private sale of the goods in block or in parcels, at

quirements of § 7210(b) are applicable here. *Complaint* at ¶ 22. Section 7210 sets forth two procedures by which a warehouseman may enforce its lien [6]. Subsection (a) relates to commercial storage by a warehouseman. Subsection (b), however, applies to the enforcement of a warehouseman's lien "on goods other than goods stored by a merchant in the course of his business." As stated in the Uniform Commercial Code Comment accompanying § 7210, subsection (b) "embraces principally storage of household goods by private owners". The requirements of § 7210(b) are stricter than those in § 7210(a), particularly as they relate to notice and publication. The reason expressed for § 7210(b)'s strict requirements is that "[n]onvariable rules prevent storers and transporters from overreaching their customers and discriminating between them." *Owen,* 11 Kan.App.2d 127, 715 P.2d 1040, 1 U.C.C.Rep.Serv.2d 198 (quoting *Kellenberger v. Bob Meyers Moving & Storage Co., Inc.,* 595 P.2d 1229, 1232, 26 U.C.C.Rep.Serv. 484 (Okla.Ct.App.1979)).

At first glance, the instant factual matter does not fit squarely into either § 7210(a) or (b). Here, we have a hybrid situation; the Property is household goods stored by the landlord PHA, not the Debtor who is the private owner. Yet the limited applicability of subsection (a) to "goods stored by a merchant in the course of his business", mandates resort to subsection (b) to define Superior's obligations since PHA that stored the Debtor's goods is not a merchant.

Merchant is not defined in Article 7 of the U.C.C. nor is it defined in the U.C.C.'s general definition section § 1201. We do, however, find a definition contained in Article 2 which deals with Sales. A merchant there is a person who "deals in goods of the kind; or otherwise by his occupation holds himself out as having knowledge or skill particular to the practices or goods involved in the transac-

any time or place and on any terms which are commercially reasonable, after notifying all persons known to claim an interest in the goods. Such notification must include a statement of the amount due, the nature of the proposed sale and the time and place of any public sale. The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the warehouseman is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the warehouseman either sells the goods in the usual manner in any recognized market therefor, or if he sells at the price current in such market at the time of his sale, or if he otherwise sold in conformity with commercially reasonable practices among dealers in the type of goods sold, he has sold in a commercially reasonable manner. A sale of more goods than apparently necessary to be offered to insure satisfaction of the obligation is not commercially reasonable except in cases covered by the preceding sentence.

(b) Procedure for enforcement of lien.—The lien of a warehouseman on goods other than goods stored by a merchant in the course of his business may be enforced only as follows:

(1) All persons known to claim an interest in the goods must be notified.

(2) The notification must be delivered in person or sent by registered or certified letter to the last known address of any person to be notified.

(3) The notification must include an itemized statement of the claim, a description of the goods subject to the lien, a demand for payment within a specified time not less than ten days after receipt of the notification, and a conspicuous statement that unless the claim is paid within the time the goods will be advertised for sale and sold by auction at a specified time and place.

(4) The sale must conform to the terms of the notification.

(5) The sale must be held at the nearest suitable place to that where the goods are held or stored.

(6) After expiration of the time given in the notification, an advertisement of the sale must be published once a week for two weeks consecutively in a newspaper of general circulation where the sale is to be held. The advertisement must include a description of the goods, the name of the person on whose account they are being held, and the time and place of the sale. The sale must take place at least 15 days after the first publication. If there is no newspaper of general circulation where the sale is to be held the advertisement must be posted at least ten days before the sale in not less than six conspicuous places in the neighborhood of the proposed sale.

**6.** Warehouseman's Act § 7209(a) creates a statutory lien in favor of a warehouseman on goods in his possession "for charges for storage or transportation ..., insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law."

tion...." 13 Pa.C.S.A. § 2104. The commentary to this section explains that

> [t]he term 'merchant' as defined here roots in the 'law merchant' concept of a professional in business. The professional status under the definition may be based on specialized knowledge as to the goods, specialized knowledge as to business practices, or specialized knowledge as to both and which kind of specialized knowledge may be sufficient to establish the merchant status is indicated by the nature of the provisions.

13 Pa.C.S.A. § 2104 comment at ¶ 2. While the definitions set forth in § 2104 are expressly applicable to Article 2, courts attempting to define "merchant" for the purposes of § 7210(b) have sought guidance, as will we, from the definition provided in § 2104. *Scott v. Hurd–Corrigan Moving & Storage Co., Inc.*, 103 Mich.App. 322, 302 N.W.2d 867, 30 U.C.C.Rep.Serv. 1649 (1981). Under neither definition of merchant contained in § 2104 do we find PHA to be a merchant.[7] PHA does not deal[8] in goods of the kind, i.e., household goods, or any kind for that matter nor does it hold itself out as having knowledge or skill peculiar to household goods. Since we believe the less rigorous compliance standard in subsection (a) was intended for the one who deals in or has knowledge of the goods stored, we conclude that the more stringent requirements of § 7210(b) must be applied.

Other courts in similar factual situations have concluded, without discussion, that a warehouseman is required to dispose of stored goods owned by evictees pursuant to the procedures set forth under § 7210(b).

*See Miller*, 808 P.2d 715, 14 U.C.C.Rep. Serv.2d 542 (1991); *Moore*, 548 N.E.2d 1211, 11 U.C.C.Rep.Serv.2d 193 (1990) (also construing a version of § 7209 different from that adopted in Pennsylvania and considering whether a warehouseman has a valid lien against the property of evictees); *Young*, 540 N.Y.S.2d 654, 9 U.C.C.Rep.Serv.2d 204 (1989) (same, concluding that notwithstanding that under New York law a warehouseman does not have a valid warehouseman's lien on evictee's goods, placed into storage by someone other than the evictee, the warehouseman was nonetheless entitled to sell the goods under § 7210); *Owen*, 11 Kan.App.2d 127, 715 P.2d 1040, 1 U.C.C.Rep.Serv.2d 198.

Section 7210(b) contains precise sale requirements which are to be strictly enforced. *Steiner, id. And see Hughes v. Accredited Movers, Inc.*, 190 N.J.Super. 71, 461 A.2d 1203, 36 U.C.C.Rep.Serv. 938 (1983); 7 Anderson, *Uniform Commercial Code* § 7–210:8 (3d ed. 1993). *See also Kellenberger*, 595 P.2d 1229, 26 U.C.C.Rep.Serv. 484. We find that Superior has not complied with the procedures set forth in § 7210(b). Specifically, Superior failed to: deliver notification to the Debtor in person or by registered or certified letter, § 7210(b)(2), which included a description of the goods and a statement that if the goods were not removed by a specified time not less than ten days after receipt of notification, the goods will be advertised for sale and sold by auction at a specified time and place,[9] § 7210(b)(3); sell the Property in accordance with any such notice at the nearest suitable place to where the Property was

---

**7.** "Merchant" has also been defined in the following manner:
> One who is engaged in the purchase and sale of goods; a trafficker; a retailer; a trader. Term commonly refers to person who purchases goods at wholesale for resale at retail; i.e. person who operates a retail business (retailer).

Black's Law Dictionary 987 (6th ed. 1990). Under that definition PHA does not qualify as a merchant either.

**8.** "Deal" has been defined as follows: "To traffic, to transact business; to bargain or trade. Also, to act between two persons; to intervene, or to have to do with." Black's Law Dictionary 399 (6th ed. 1990).

**9.** Where, as here, Superior was not disposing of the Property to enforce a warehouseman's lien, certain of the information required by the statute would not be implicated, i.e., an itemized statement of the claim, a demand for payment within a specified time not less than ten days after receipt of the notice, and a conspicuous statement that unless the claim was paid within the specified time, the goods will be advertised for sale and sold at an auction at a specified time and place. However, since the Property is to be sold pursuant to the provisions of § 7210, it follows that a description of the goods to be sold and a statement that the goods will be advertised for sale and sold at an auction at a specified time and place must be provided.

stored, §§ 7210(b)(4) and (5); and publish an advertisement of the sale containing the information and at the times specified in § 7210(b)(6). Superior admits that it did not provide the Debtor with notice prior to disposing of the Property. Record at 105. Superior also admits that it did not publish an advertisement of the sale of the Property prior to disposing of it. *Id.* Clearly, Superior failed to comply with the notice of sale, publication and sale requirements of § 7210(b).[10]

The Debtor claims that Superior failed to exercise reasonable care in the storage of the Property in violation of § 7204(a). However, the Debtor presented no evidence that supported this allegation and therefore we find no violation under § 7204(a).

The Debtor also claims that Superior failed to deliver the Property to her upon her demand in violation of § 7206(d). Section 7206(d) provides as follows:

(d) Delivery of goods upon demand.—The warehouseman must deliver the goods to any person entitled to them under this division upon due demand made at any time prior to sale or other disposition under this section.

The Debtor testified and Brenfleck confirmed that during the first 30 days of storage she sought to remove her and her children's clothing from storage. The parties disagree on the response to that request. Debtor claims she was denied access to her Property by Superior. Record at 19. We credit Brenfleck's testimony that he did not deny the Debtor access to the Property, and she never came to retrieve her goods. Record at 78. When the Debtor contacted Superior at the end of September, 1993, she did not demand delivery of the Property but, rather, sought to arrange continued storage. Finding that Superior did not refuse the Debtor's request for the clothing and no

other "demand" for the goods was made, no violation of § 7206(d) is found.

The Debtor next argues that Superior is liable for conversion under § 7210(i) of the Warehouseman's Act which provides as follows:

(i) Liability of warehouseman for noncompliance.—the warehouseman is liable for damages caused by failure to comply with the requirements for sale under this section and in case of willful violation is liable for conversion.

The drafters of § 7210(i) are silent as to the meaning of "willful". Courts have attempted to define "willful" as it applies to § 7210(i). The court in *Bradford v. Muinzer*, 498 F.Supp. 1384 (N.D.Ill.1980), considering § 7210 as adopted in Illinois which is identical to the version adopted in Pennsylvania, concluded, after examining the definition of "willful" in the context of other civil statutes in a variety of states, that "the term 'willful' violation in section 7210(9) means, as it does in other civil statutes, a deliberate or intentional action taken with knowledge of the statute's application and with disregard of the action's legality." *Id.* at 1391. *And see* 7 Anderson, *Uniform Commercial Code* § 7–210:11 (quoting same); *see also Scott*, 30 U.C.C.Rep.Serv.2d at 1659 ("Wilful violation of § 7210, rendering one liable for conversion, implies a knowing, conscious noncompliance with the statute or a deliberate unwillingness to discover and obey the law."), *Long's Transfer & Storage v. Busby*, 358 So.2d 393, 24 U.C.C.Rep.Serv.2d 210 (Miss. 1978) (quoting *E.L. Bruce Co. v. Edwards*, 192 Miss. 1, 3 So.2d 846 (1941)) (The term willful "implies both knowledge and intent in a degree of recklessness so gross as to constitute willfulness. Mere mistake or carelessness is not enough.") For the violation to be "willful", the warehouseman "need not

---

10. While the general common-law does not impose a duty on PHA to store the goods, the legislature in Pennsylvania in adopting Article 7 of the Uniform Commercial Code found it appropriate to impose a statutory duty on a warehouseman for the benefit of both the persons on whose account it stores goods as well as any other persons known to have an interest in the goods and did not exclude evictees from being a beneficiary of the requirements of the Ware-

houseman's Act. Superior contends that the result of finding there to be such a duty on a warehouseman will disable PHA from finding contractors or subject PHA to liability for misrepresentation of the right to dispose. While we have no evidence that these consequences will ensue, the statute, not policy implications, dictates our ruling. The public policy implications of imposing these requirements are for the legislature, not the courts.

have a bad purpose or evil motive." *Bradford*, 498 F.Supp. at 1391. "It must be shown that there was knowledge, intent, design, or deliberation to deprive the customer of rights and it is not sufficient to show that there was a mistake, negligence or inadvertence." 7 Anderson, *Uniform Commercial Code* § 7–210:11. In *Bradford*, the court concluded that the warehouseman's violation of the Warehouseman's Act was willful where he was "unquestionably" aware of the applicability of the Warehouseman's Act to the sale at issue, he failed to comply with a number of the statute's requirements, and he continued with the sale even after he learned that the bailor had filed suit for injury to her property. *Bradford*, 498 F.Supp. at 1391.

Applying the foregoing explications of "willfulness" to the instant facts, we find that Superior's violation of the provisions of § 7210(b) of the Warehouseman's Act was not "willful" subjecting it to damages for conversion. Based on the testimony of Brenfleck, which was entirely credible and forthright, it is unquestionable that Superior was unaware of the application of the Warehouseman's Act to its termination of storage of the Property. Superior fully complied with the terms of the Superior–PHA Contract, which it believed solely determined its obligation with respect to the Property. In fact, Superior's went further than it viewed its obligation to extend when it held the Property for 12 to 15 days longer than required by the Superior–PHA Contract and offered to allow the Debtor to pay for continued storage in installments. Consequently, we find that Superior did not willfully violate the terms of the Warehouseman's Act thereby becoming liable for conversion of the Property.

*Liability for Noncompliance with Warehouseman's Act.* A warehouseman's liability for noncompliance with the requirements of sale under § 7210(b) is set forth in § 7210(i) which states as follows:

   (i) Liability of warehouseman for noncompliance.—The warehouseman is liable for damages caused by failure to comply with the requirements for sale under this section and in case of willful violation is liable for conversion.

■ Courts have calculated damages caused by sales in violation of § 7210(b) as the value of the goods at the time of the sale less the amount of the warehouseman's lien. *Hughes*, 461 A.2d 1203, 36 U.C.C.Rep. Serv.2d at 941. We agree that this is the proper calculation of damages since it represents what the bailor would have received had the goods been sold in compliance with the provisions of the Warehouseman's Act.

■ The Debtor has requested actual damages in the amount of $5,560 (80% of the 1992 value).[11] As previously stated, the Debtor submitted into evidence a list of the Property and the values she assigned to the various items which totalled $6,706. Exhibit P–7. The Debtor claims that all of the Property was in "good condition" and some of it was "brand new". Record at 12–13. The Debtor did not purchase all of the Property herself, some of the larger pieces were a gift from a brother-in-law. Record at 13. The Debtor did not know what she or her brother-in-law originally paid for many of the items. *Id.* The Debtor claims that receipts for many of the items were placed in storage with the rest of the Property and disposed of by Superior. Record at 56. The Debtor's valuations of the Property, therefore, are based upon her approximation, or guess, of their values. Record at 39–50.

Superior, on the other hand, claims that the Property was not in good condition and referred to an inventory of the Property prepared by Superior's workers who performed the move indicating that most of the Property was in scratched, faded, chipped, or badly worn condition. Record at 69–70; Exhibit P–6.

The Debtor admits that the value of the Property should be discounted by 20% for the passage of time from 1992 to 1995. Hence a deduction of $1,341.20 is required, resulting in a revised value figure of $5,364.80. We question whether furniture, appliances and other personal property is worth 80% of its purchase price three years

---

11. The Debtor has also requested attorneys' fees, treble damages under UDAP, $5,000 for emotional distress, and punitive damages which requests are addressed later.

after it is purchased. Superior presenting no evidence to the contrary, we accept the Debtor's discount.

We also find that a deduction of 25% of $6,706, or $1,676.50, is warranted in light of the condition of the Property. We place significant weight on Exhibit P–6, the list of the Property and its condition prepared contemporaneously with the eviction. Exhibit P–6 shows that most if not all of the Property was in scratched, faded, chipped and/ or badly worn condition. For example, the condition of the Debtor's color television is listed as scratched in all locations. A table is listed as scratched and chipped and with a door missing. Two coffee tables are listed as faded, worn, chipped and scratched. The Debtor's washing machine is listed as scratched and chipped. Not one item listed on Exhibit P–6 is listed without negative comment regarding its condition. Exhibit P–6 refutes Debtor's testimony that all of the Property was in good or new condition. Furthermore, Superior testified that it discarded certain items that were in poor or broken condition while donating to charity the items that were usable. The disposition of the Property refutes Debtor's contention that the Property was all in good condition. Consequently, we make a total deduction of $3,017.70 and enter judgment in favor of the Debtor in the amount of $3,688.30 representing actual damages caused by Superior's failure to comply with the sale requirements of § 7210.

■ Debtor has also requested damages of not less than $5000 for emotional distress arising from the loss of the Property, particularly the children's toys, clothes and letters from their father. Amended Complaint at ¶ 35. However, the record is devoid of support for that claim. Debtor testified that she was trying to get to her "personal stuff" so she could prove what was taken. Record at 13. She also testified to her reaction upon learning that the Property was disposed of:

> And they told me my stuff was gone. And I say gone. It was just like—and that was it. They said it was gone. And I didn't know how to take it, gone. I just took it as gone.

Record at 23. Upon being asked by her attorney to describe what happened after she found out her furniture was gone, she stated:

> After I found it was gone, I left it as gone and it was like I had to start all over again from scratch, which I'm still scratching today.

Id. Based on this testimony, which is the sole testimony that describes Debtor's emotional state after the disposition of the Property in violation of the Warehouseman's Act, we find no evidence of Debtor's emotional distress or trauma. This finding is consistent with the Debtor's actions prior to the disposition of the Property by Superior. The Debtor was given 30 days during which she could regain possession of Property from Superior at no cost. We credit Brenfleck's testimony that the Debtor would have been permitted access to the storage facility to remove all or part of her Property. Record at 78, 81. Yet she did not even remove the smaller items of personalty such as her children's clothing and toys that she testified were of importance to her. The Debtor waited until two months after the eviction to attempt to arrange for continued storage with Superior; almost one month after the deadline explained to her by Brenfleck. The Debtor's claim that she suffered emotional distress from the loss of these possessions is undermined by her lack of action to secure or protect the Property.

■ The Debtor also requests an award of punitive damages. Under Pennsylvania law, assessment of punitive damages is proper "when a person's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct, ..., and are awarded to punish such conduct." *SHV Coal, Inc. v. Continental Grain Co.*, 526 Pa. 489, 493, 587 A.2d 702, 704 (1991). We do not find that Superior's conduct rises to the level of outrageousness required to impose punitive damages. We have found that Superior believed that its only duty ran to PHA with whom it contracted and having acted in conformity with that contract, it was legally entitled to take the steps it took with respect to the Property. While acting under that belief, albeit mistaken, Superior nonetheless attempted to assist

the Debtor in reclaiming the Property. Superior held the Property for 12 to 15 days longer than it advised the Debtor it would in the hope that the Debtor would make arrangements to pick up the Property or for continued storage. Record at 84. This conduct does not reflect an evil motive or reckless indifference to the rights of others requiring punishment and deterrence. We assume that our finding liability under the Warehouseman's Act for disposition of an evictee's personalty at the request of the landlord will be sufficient cause to deter the conduct complained of in future dealings with the goods of PHA evictees. Moreover, courts have held that an award of punitive damages is not appropriate where conversion under § 7210(i) is not found. *Miller*, 808 P.2d 715, 14 U.C.C.Rep.Serv.2d at 545 ("Mere non-compliance with the statutory requirements for sale is not conversion, and will not result in punitive damages.") Accordingly, we deny Debtor's request for punitive damages.

Finally, the Debtor requests an award of attorneys' fees. The law in Pennsylvania regarding the award of attorneys' fees is that "a litigant is responsible for his own counsel fees absent an agreement by the parties or some other established exception." *Pittsburgh Live, Inc. v. Servov*, 419 Pa.Super. 423, 429–30, 615 A.2d 438, 441–42 (1992). The Warehouseman's Act does not contain a provision specifically providing for an award of attorneys' fees. *See Scott*, 302 N.W.2d 867, 30 U.C.C.Rep.Serv.2d at 1659–60 (construing Michigan law and refusing to award attorney's fees under the Warehouseman's Act finding no support for such an award in the Warehouseman's Act or under state law.) The Debtor providing no support for its request for attorneys' fees, that request is denied.

### C.

*Violation of UDAP.* The Debtor next argues that Superior's violations of the Warehouseman's Act constitute a violation of UDAP, 73 Pa.S.A. § 201–3. UDAP protects consumers of goods and services from unfair and deceptive practices or acts. The objective of UDAP is to "place on more equal terms seller and consumer." *Smith v. Commercial Banking Corp. (In re Smith)*, 866 F.2d 576, 581 (3d Cir.1989) (quoting *Commonwealth v. Monumental Prop., Inc.*, 459 Pa. 450, 458, 329 A.2d 812, 816 (1974)). Specifically, section 3 of UDAP provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by ... section 2 of th[e] act and regulations promulgated under section 3.1 of this act are hereby declared unlawful." UDAP § 201–3. Section 2 of UDAP enumerates 17 specific acts which constitute unfair or deceptive acts or practices, the last one being an all inclusive catch-all. UDAP § 201–2(4). Courts generally have adopted a "flexible and broad" approach with respect to UDAP. *Id.* at 581–82.

The Debtor does not identify which of the unfair or deceptive act(s) listed in UDAP § 201–2(4) that she claims Superior has committed. Rather, she argues that Superior's violation of the Warehouseman's Act is a violation of UDAP entitling her to treble damages. A preliminary question which we must decide is whether the Debtor has the right to a "private action" under UDAP § 201–9.2 entitling her to an award of damages thereunder. We find that she does not.

UDAP § 201–9.2 provides that

any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of [UDAP], may bring a private action, to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), ...

Courts interpreting UDAP § 201–9.2 have concluded that its language contains two express limitations: (1) the purchase of goods and services must lead to a loss as a result of an unfair or deceptive act or practice; and (2) the class of litigants includes only those persons who purchase or lease goods or ser-

vices primarily for consumer use rather than commercial use. *Smith*, 866 F.2d at 583.

■ An integral part of both of these limitations is that the consumer *purchase or lease* goods or services. Here, the Debtor did not purchase or lease goods or services from Superior. As stated above, the only contract pursuant to which Superior stored the Property is the Superior–PHA Contract. Debtor argues that she may bring a private action under UDAP because she *attempted* to become a purchaser of Superior's services but was prevented from doing so because Superior disposed of the Property. Superior gave the Debtor the opportunity to become a purchaser of Superior's services which she did not accept during the time it was offered to her. When she finally contacted Superior expressing her intention to enter into a storage agreement, the goods had been disposed of by Superior, albeit in a manner which is not permitted under the Warehouseman's Act. Debtor's argument appears to be that but for Superior's violation of the Warehouseman's Act, Debtor would have been a purchaser. Yet whether Debtor and Superior would have entered an agreement for the purchase of Superior's services is speculative. In any event, UDAP does not provide a private action for "prospective" purchasers. This would create an unlimited class of plaintiffs. Moreover, the legislature, when it drafted UDAP, knew how to provide a class of individuals with a private action and did so in § 201–9.2. *See Valley Forge Towers South Condominium v. Ron–Ike Foam Insulators, Inc.*, 393 Pa.Super. 339, 574 A.2d 641 (1990), *aff'd without op.*, 529 Pa. 512, 605 A.2d 798 (1982). The legislature chose not to provide "prospective" purchasers with the same rights as purchasers. *See Alfred M. Lutheran Distributors, Inc. v. A.P. Weilersbacher, Inc.*, 437 Pa.Super. 391, 650 A.2d 83 (1994) (discussing interpretation of Pennsylvania statutes to determine if an individual is included in a class of entities afforded a private statutory cause of action under the Pennsylvania Liquor Code, 47 Pa.S.A. § 4–492 and making reference to UDAP.)

The Debtor not presenting any authority to the contrary, we find that the Debtor is not a purchaser or lessee of goods and services and, therefore, is not entitled to maintain a private action under UDAP. Consequently, the Debtor's request for damages under UDAP is denied.[12]

### D.

*Liability as Fraudulent Transfer Under 11 U.S.C. § 548.* The Debtor also contends that the transfer was fraudulent pursuant to 11 U.S.C. § 548, and demands that Superior must either return the Property or the value thereof to the Debtor. Debtor admits in her pre-trial memorandum, that the only practical relief that she can request under § 548 is that Superior give to her the value of the Property since Superior no longer is in possession of the Property. Plaintiff's Pre–Trial Memorandum at 16. Since we have already provided Debtor with that relief as a result of our finding Superior to be liable for damages under the Warehouseman's Act, we need not reach the question of whether liability exists under § 548 of the Bankruptcy Code.

An Order consistent with the foregoing Opinion will be entered.

### ORDER

**AND NOW,** this 19th day of May, 1995, upon consideration the Debtor's First Amended Complaint for Conversion of Personal Property and Violation of the Unfair Trade Practices and Consumer Protection Law (the "Complaint"), the parties' briefs relating thereto, and after notice and trial on

---

**12.** The Debtor also appeared to argue that Superior violated UDAP because the documents given to the Debtor at the eviction, Exhibits P–1 and P–2, were confusing. As stated in the body of our Memorandum Opinion, while the language in Exhibits P–1 and P–2, could have been clearer with respect to the consequences of failing to act within 30 days, the language of those documents in conjunction with the information given to the Debtor by Superior's owner, clearly and sufficiently explained to the Debtor her options with respect to the Property. Although the Debtor did not formally pursue this ground for relief, we nonetheless would deny the Debtor's request for damages on this ground as well because she is not a "person who purchases or leases goods or services" entitled to a private action under 73 Pa.S.A. § 201–9.2.

March 28, 1995, and for the reasons stated in the accompanying Opinion;

It is hereby **ORDERED** that:

1. Judgment is entered in favor of Debtor and against Superior Moving & Storage, Inc. ("Superior") in the amount of $3,688.30 for Superior's violation of 13 Pa.C.S.A. § 7210(b); and

2. All other requests for relief are **DENIED**.